IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LINA CALVENTO,

       Plaintiff,                 No. CIV S-08-0678 GGH

   vs.

MICHAEL J. ASTRUE,         <u>ORDER</u>
Commissioner of
Social Security,

       Defendant.

_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), and Disabled Widow's Benefits. For the reasons that follow, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

<u>BACKGROUND</u>

      Plaintiff, born March 15, 1934, first applied on December 7, 1983 for disability benefits. Plaintiff alleged she was unable to work due to reaction to chemical exposure, anxiety and depression. (Tr. at 278.) She applied for Disabled Widow's Benefits on May 9, 1984. (Tr.

1    at 152.)  These applications were denied on March 28, 1987.  (<u>Id</u>. at 277.)  She then filed another

2    application for SSI in October, 1989, and an application for disabled widow's benefits on

3    January 20, 1993.  (<u>Id</u>. at 277.)  The SSI application was approved, and the widow's benefits

4    application was approved as of 1991, but plaintiff requested reconsideration of an earlier onset

5    date for that application.  (<u>Id</u>. at 277-78.)  The Agency then found an established onset date of

6    October 1, 1989.  Plaintiff filed a request for an earlier onset date of 1979.  (<u>Id</u>. at 278.)  This

7    request was denied, with a finding that plaintiff was not disabled from March 29, 1987 through

8    October 1, 1989.  (<u>Id</u>. at 26.)  The case was remanded by the district court and after a hearing, the

9    ALJ again found that plaintiff was not disabled during the aforementioned dates.  (<u>Id</u>. at 277-

10   285.)

11           In a decision dated May 23, 2005, ALJ Ariel Sotolongo made the following

12   findings:[1]

13   _____

14        [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
     Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to
15   disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in
     part, as an "inability to engage in any substantial gainful activity" due to "a medically
16   determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
     A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
17   <u>See</u> 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; <u>Bowen v. Yuckert</u>, 482 U.S.
     137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
18           Step one:  Is the claimant engaging in substantial gainful
             activity?  If so, the claimant is found not disabled.  If not, proceed
19           to step two.
             Step two:  Does the claimant have a "severe" impairment?
20           If so, proceed to step three.  If not, then a finding of not disabled is
             appropriate.
21           Step three:  Does the claimant's impairment or combination
             of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
22           404, Subpt. P, App.1?  If so, the claimant is automatically
             determined disabled.  If not, proceed to step four.
23           Step four:  Is the claimant capable of performing his past
             work?  If so, the claimant is not disabled.  If not, proceed to step
24           five.
             Step five:  Does the claimant have the residual functional
25           capacity to perform any other work?  If so, the claimant is not
             disabled.  If not, the claimant is disabled.
26   <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

                                                  2

1.  The claimant meets all of the nondisability requirements for Disabled Widow's Insurance Benefits set forth in Section 202(e) of the Social Security Act (with the exceptions noted in 20 CFR § 404.335(e)).  The claimant's prescribed period begins April 11, 1984 and ends March 31, 1991.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's mild degenerative disc disease; possible allergic reaction; generalized anxiety disorder with depressive features are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant had the following residual functional capacity during the period at issue, March 29, 1987 to October 1, 1989:  the claimant is able to lift/carry 50 pounds occasionally, 25 pounds frequently, and stand, walk or sit for 6 out of 8 hours a day.  She is able to climb, balance, kneel, crawl, stoop and crouch frequently.  She should avoid concentrated exposure to fumes, dust, gases, and other lung irritants.  She is able to perform work that is simple and unskilled (not involving complex or detailed instructions).

7.  The claimant's past relevant work as a restaurant cashier, DOT 311.472-010, light, unskilled, SVP 2 did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.  The claimant's medically determinable mild degenerative disc disease; possible allergic reaction; generalized anxiety disorder with depressive features do not prevent the claimant from performing her past relevant work.

9.  The claimant was not under a "disability" as defined in the Social Security Act, at any time from March 29, 1987 to October 1, 1989 (20 CFR § 404.1520(f)).

---

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

1    (Tr. at 284-85.)

2            For the current application, the time period during which plaintiff must establish

3    disability is after March 28, 1987, the date of the decision on the prior application finding

4    plaintiff was not disabled, due to its administrative res judicata effect, through October 1, 1989,

5    the date plaintiff was approved for benefits.  Having been denied disability on her first

6    application, a presumption of continuing nondisability arises.  Taylor v. Heckler, 765 F.2d 872,

7    875 (9th Cir. 1985).  Plaintiff  "can overcome this presumption by proving 'changed

8    circumstances' indicating a greater disability."  Id. (quoting Booz v. Secretary, 734 F.2d 1378,

9    1379-80 (9th Cir.1984)); see also Pearson v. Secretary of Health and Human Services, 780 F.

10   Supp. 682, 686 (E.D. Cal.1991) (presumption from prior decision of continuing non-disability

11   must be overcome by a showing of "changed circumstances" indicating a greater disability).

12   ISSUES PRESENTED

13           Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Accurately

14   Characterize the Medical Evidence and Credit the Opinions of the Treating and Examining

15   Physicians Without a Legitimate Basis; B. Whether the ALJ Failed to Credit Plaintiff's

16   Statements as to the Nature and Extent of Functional Limitations as Required by Law; and C.

17   Whether the ALJ Failed to Pose a Legally Adequate Hypothetical to the Vocational Expert.

18   LEGAL STANDARDS

19           The court reviews the Commissioner's decision to determine whether (1) it is

20   based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

21   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

22   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

23   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

24   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

25   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

26   is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

4

1    ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

2    "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

3    rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

4    ANALYSIS

5           A. The ALJ Properly Considered the Opinions of the Treating and Examining Physicians

6           Plaintiff contends that the opinions of various treating and examining physicians

7    were improperly rejected by the ALJ.

8            The weight given to medical opinions depends in part on whether they are

9    proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246

10   F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2] Ordinarily,

11   more weight is given to the opinion of a treating professional, who has a greater opportunity to

12   know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

13   Cir. 1996).

14          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

15   considering its source, the court considers whether (1) contradictory opinions are in the record;

16   and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of

17   a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81

18   F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be

19   rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating

20   professional's opinion generally is accorded superior weight, if it is contradicted by a supported

21   examining professional's opinion (supported by different independent clinical findings), the ALJ

22

23          [2] The regulations differentiate between opinions from "acceptable medical sources" and
     "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed
24   psychologists are considered "acceptable medical sources," and social workers are considered
     "other sources." Id. Medical opinions from "acceptable medical sources," have the same status
25   when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific
     regulations exist  for weighing opinions from "other sources." Opinions from "other sources"
26   accordingly are given less weight than opinions from "acceptable medical sources."

1  may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

2  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

3  weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

4  2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and

5  supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

6  (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

7  881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

8  insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

9         First, plaintiff claims that the ALJ erred in rejecting Dr. Sison.  In regard to this

10 treating doctor, the ALJ explained that Dr. Sison was a pediatrician and not a psychiatrist or

11 psychologist, and therefore she was "venturing far afield from her specialty." (Tr. at 282.)  He

12 gave her physical findings little weight, for the same reasons as previous ALJ Warner, because

13 they were completely unsupported by the objective evidence.  (Id.)  Furthermore, the ALJ found

14 that Dr. Sison's assessment of "virtually total environmental, postural, sitting, standing, lifting,

15 carrying and other physical function restrictions due to degenerative joint disease, arthritis of

16 hands, obesity and peripheral neuropathy" was "so obviously exaggerated, unsupported by

17 clinical findings, contradictory to other medical records and presumabl[y] based on the

18 claimant's own subjective complaints." (Id. at 281.)

19        All of the aforementioned reasons are sufficiently specific and legitimate to reject

20 this physician's opinion, and they are supported by the record.

21        Dr. Sison treated plaintiff from 1986 to 1991.  The records in the transcript are

22 dated May 20, 1990 and later, outside of the period at issue.  (Tr. at 236-53.)  This pediatrician[4]

23

---

24     [3]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
25 (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

26     [4]  (Tr. at 364.)

1   diagnosed generalized anxiety disorder, severe sensitivity after exposure to certain inhaled

2   noxious toxic chemicals, ovarian cysts, status post Bell's Palsy, status post hysterectormy, status

3   post viral neuritis affecting cranial nerves, degenerative joint disease, arteriosclerotic heart

4   disease, and hiatal hernia.  (Id. at 245.)  In regard to functional limitations, Dr. Sison opined that

5   plaintiff had a fair ability to deal with the public, function independently, maintain attention and

6   concentration, understand, remember and carry out simple instructions, and relate predictably in

7   social situations.  (Id. at 239-40.)  She had poor or no ability to follow work rules, relate to co-

8   workers, use judgment, interact with supervisors, deal with work stresses, understand, remember

9   and carry out complex or detailed instructions, behave in an emotionally stable manner, and

10   demonstrate reliability.  (Id.)

11        Plaintiff argues first that Dr. Sison had clinical findings and objective medical

12   evidence to support her opinions, and second that the testifying medical expert opined that her

13   specialty in pediatrics would change his opinion about her if there was a huge discrepancy

14   between her records and others, but conceded that here there was no discrepancy between Dr.

15   Sison's descriptions and what was described longitudinally.  (Id. at 365.)  Therefore, plaintiff

16   argues, the ALJ mischaracterized this testimony by noting that the medical expert disagreed with

17   Sison, implying that it was because of Sison's specialty.  (Pl.'s Mot., dkt. #21 at 36.)

18        Turning to the second objection first, Dr. Anderson, the medical expert, did testify

19   as plaintiff describes, and the ALJ did mischaracterize Dr. Anderson's testimony on this one

20   point.  (Id. at 282.)  However, the ALJ also clearly stated to Dr. Anderson, and in his findings,

21   that *he* had to take into account that Dr. Sison was not a psychiatrist.  (Id. at 364, 282.)  The ALJ

22   is encouraged to "give more weight to the opinion of a specialist about medical issues related to

23   his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §

24   404.1527(d)(5).  In certain situations, a treating doctor's opinion may carry little weight,

25   including where the opinion is on a matter not related to her area of specialty.  Holohan v.

26   Massanari, 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001).  Plaintiff's citation to Sprague v. Bowen,

1   812 F.2d 1226, 1232 (9th Cir. 1987), for the proposition that a long time treating physician is

2   qualified to render an opinion on his patient's mental state, is distinguishable.  Here, there is

3   almost no supporting objective evidence of mental problems serious enough to interfere with

4   work.  Additionally, there is no evidence that Dr. Sison prescribed any medication for plaintiff's

5   mental ailments, raising the inference that plaintiff's condition was not that severe.

6        Dr. Anderson testified that during the time period at issue, the diagnosis was

7   uniformly described as generalized anxiety or generalized anxiety disorder with depressive

8   features.  (Id. at 360.)  The only major exhibit by Dr. Sison is the May 20, 1990 report described

9   above which Dr. Anderson noted was outside the time period.  (Id. at 361.)  Nevertheless, Dr.

10  Sison had described the highest GAF in the past year, which would include the time period at

11  issue, of 70, with a current GAF score of 60 on May 30, 1990, eight months after the period at

12  issue ended.[5]  (Id. at 362, 252.)  As defendant points out, this mild score is inconsistent with Dr.

13  Sison's findings of poor or no ability to handle numerous job functions.  (Id. at 239-41.)  Dr.

14  Anderson noted that there was very little in the record by Dr. Sison during 1987 or 1988, but of

15  those notes, there was no reference to anxiety or depression.  (Id. at 362.)

16       Dr. Anderson's reference to the dearth of records by Dr. Sison pertains to

17  plaintiff's first objection, that Dr. Sison had clinical findings to support her opinions.  The court

18  notes that the record consists of only three reports by this doctor, despite the assertion that

19  treatment occurred over a four year period.  These records are dated May 25, 1990, May 30,

20  1990, and April 23, 1991, all of which post-date the period at issue.  Although these records

21  include Dr. Sison's clinical findings to support her assessment, there are no progress reports,

22

23       [5]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
24  Disorders 32 (4th ed.1994) ("DSM IV").   According to the DSM IV, A GAF of 61-70 indicates
    "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social,
25  occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
    generally functioning pretty well, has some meaningful interpersonal relationships."  DSM IV at
26  32.

treatment records, mental assessments or mental status exams attached to these assessments.
The only discussion of plaintiff's past mental state is Dr. Sison's notation that plaintiff was in
weekly or bi-weekly supportive therapy depending on her needs.  No dates are given for this
therapy.  As of the date of the report, May 25, 1990, it was noted that plaintiff was better after
years of therapy, and less anxious.  She was being seen only once per month or as needed at this
time due to her progress.[6]  (Id. at 245.)

In general, medical reports should not be disregarded solely because they are
rendered retrospectively.  Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988).  In fact,
retrospective medical reports are relevant to a prior period of disability.  Id.  Considerations to be
made in whether to give such a report less weight include:  whether the report specifically
assessed plaintiff's functional capacity prior to the insured's expiration date, whether the medical
reports created during the time period at issue made only limited references to limitations in
functional capacity; whether intervening circumstances such as a car accident exacerbated the
medical condition; and whether the retrospective opinion conflicted with the same physician's
earlier opinion.  Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995).

> Historically, the courts have recognized conflicting medical
> evidence, the absence of regular medical treatment during the
> alleged period of disability, and the lack of medical support for a
> doctor's report based substantially on a claimant's subjective
> complaints as specific, legitimate reasons for disregarding the
> treating physician's opinion. Flaten, 44 F.3d at 1463-64; Fair v.
> Bowen, 885 F.2d 597, 604 (9th Cir.1989). The ALJ is not required
> to accept the opinion of a treating or examining physician if that
> opinion is brief, conclusory and inadequately supported by clinical
> findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).

Morehead v. Astrue, 2008 WL 3891464, *5 (E.D. Wash. 2008).

Furthermore, it is well established that retrospective opinions are even less
persuasive in the specialty of mental health.  "The opinion of a psychiatrist who examines the

---

[6] Curiously, Dr. Anderson testified that a later report by Dr. Sison dated about a year
after May 25, 1990, indicated that plaintiff's condition had worsened.  (Id. at 362.)

1  claimant after the expiration of his disability insured status, however, is entitled to less weight

2  than the opinion of a psychiatrist who completed a contemporaneous exam." <u>Macri v. Chater</u>, 93

3  F.3d 540, 545 (9th Cir. 1996); <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984)

4  ("After-the-fact psychiatric diagnoses are notoriously unreliable"); <u>Weetman v. Sullivan</u>, 877

5  F.2d 20, 23 (9th Cir.1989) (new medical report following adverse administrative decision

6  denying benefits carries little, if any, weight) (citing <u>Key v. Heckler</u>, 754 F.2d 1545, 1550 (9th

7  Cir.1985)).

8         Here, Dr. Sison's assessment of plaintiff's residual functional capacity occurred

9  eight months after the end of the disability period at issue.  There are no records assessing

10  plaintiff's functioning during the period at issue.  In fact, there are no records from the pertinent

11  time period in the transcript at all.  As Dr. Anderson noted at the hearing, Dr. Sison's report

12  dated in 1991 indicates that plaintiff is considerably more disabled than she was described in

13  Sison's report from a year earlier.  (<u>Id.</u> at 362.)  Furthermore, Dr. Sison's retrospective reports

14  relate to plaintiff's mental health and are therefore even less persuasive.[7]

15         Plaintiff next claims that the ALJ ignored Dr. Pilchman's assessment of plaintiff's

16  impairment as being 25 percent.  This psychiatrist conducted one exam on May 22, 1986 for

17  purposes of a worker's compensation claim, and diagnosed generalized anxiety disorder with

18  depressive features.  (<u>Id.</u> at 169, 189.)  This exam was outside the pertinent time period which

19  began on March 29, 1987.  Although Dr. Pilchman opined that plaintiff would have difficulty if

20  she attempted to work, his report was limited to that previous time period.  Plaintiff was formerly

21

22         [7]  As analyzed in the next section, plaintiff's credibility is also at issue, and for this
additional reason, the ALJ appropriately rejected portions of the mental health opinions.  "An
23  ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-
reports that have been properly discounted as incredible."  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035,
24  1041 (9th Cir. 2008), <i>citing</i> <u>Morgan v. Comm'r Soc. Sec. Admin.</u>, 169 F.3d 595, 602 (9th Cir.
1999) (<i>citing</i> <u>Fair V. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989)).  Furthermore, "the ALJ is the
25  final arbiter with respect to resolving ambiguities in the medical evidence."  <u>Id.</u>  Here, it is
reasonable to assume that Dr. Sison's records were based on plaintiff's subjective complaints.

26

1   found not disabled for this time period.  Even if this report is considered, it found that plaintiff's

2   psychiatric incapacity was reduced by 25 percent, and was between slight and moderate but

3   closer to slight.  (Id. at 188.)  As to the ALJ's failure to mention this apportionment, since the

4   ALJ did not reject this doctor's opinion, he was not required to articulate reasons to explain his

5   decision.  "It is not necessary to agree with everything an expert witness says in order to hold that

6   his testimony contains 'substantial evidence.'"  Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir.

7   1989), citing Russell v. Bowen, 856 F.2d 81, 83 (9th Cir.1988) (citation omitted).

8        Plaintiff next asserts that the ALJ failed to address a GAF score of 35[8] as assigned

9   by Hollywood Mental Health Services.  This score was assessed between September 23, 1986

10  and February 25, 1987, and is therefore relevant only to the previous time period which has

11  already been adjudicated.  (Id. at 199.)  The higher GAF score of 70 was assessed during the

12  relevant period at issue here.

13       Even if this low GAF score is considered, however, the ALJ reasonably could

14  have relied on the higher GAF scores found by other examining sources.  The Ninth Circuit has

15  not prescribed a duty for the ALJ to address GAF scores.  The court does not disagree with the

16  basic premise that a low GAF score does not alone determine disability, but is a piece of

17  evidence to be considered with the rest of the record.  Olds v. Astrue, 2008 WL 339757, at *4 (D.

18  Kan. 2008) (citation omitted).  Yet, the GAF scale does not have a direct correlation to the

19  severity requirements in the listings of mental disorders.  65 Fed. Reg. 50746, 50764-65 (2000).

20       Plaintiff also claims that the ALJ failed to discuss Dr. Wendel's conclusion after

21  testing that plaintiff's condition was suggestive of brain damage or dysfunction, and probably a

22  decline in reasoning ability.  In this regard, the ALJ described Dr. Wendel's assessment, stating

23
24       [8]   According to the DSM IV, A GAF of 31-40 indicates "some impairment in reality
     testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major
     impairment in several areas, such as work or school, family relations, judgment, thinking, or
25   mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child
     frequently beats up younger children, is defiant at home, and is failing at school)."  DSM IV at
26   34.

1   that plaintiff was found to be in the average range of intelligence, with evidence of probable

2   decline in cognitive functioning.  "She was mildly depressed, was rather anxious and had a

3   negative self-concept."  (Id. at 282.)  The ALJ also noted later in his findings that the testifying

4   medical expert considered Dr. Wendel's report along with others, and concluded that although

5   plaintiff had a generalized anxiety disorder with depressive features, she did not meet or equal

6   the listings.  All of her other limitations were mild, except for a limitation from doing complex

7   detailed work.  (Id. at 282.)

8         Dr. Wendel's report also pre-dates the period at issue here.  This psychologist

9   examined plaintiff on September 19, 1986, six months prior to the start of the instant disability

10  period.  In any event, he predicted that the finding of evidence of brain damage or dysfunction

11  would likely affect plaintiff's reasoning ability and ability to concentrate and remember.  He also

12  noted, however, that plaintiff had an I.Q. of 100, and with vocational rehabilitation and

13  counseling, plaintiff could eventually return to work.  (Id. at 191-94.)  It was not critical that the

14  ALJ failed to mention these aspects of Dr. Wendel's report.  The ALJ is free to rely on whatever

15  evidence he chooses, even though reliance on other evidence would have caused him to reach the

16  opposite conclusion.  Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  Furthermore, an ALJ

17  may properly rely upon only selected portions of a medical opinion while rejecting other parts.

18  See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on

19  selected portions of conflicting opinion constitutes substantial evidence).  However, such

20  selective reliance must be consistent with the medical record as a whole.  See, e.g., Edlund v.

21  Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that

22  is clearly reliable).  Here, the ALJ's reliance on only portions of Dr. Wendel's report was

23  consistent with the remainder of the record.

24        The only other record of a brain abnormality was a CT scan of the head on

25  December 9, 1987, which indicated "minimal cortical atrophy and small focal atrophy," and an

26  EEG which tested brain stem auditory evoked response on June 17, 1987, and which indicated

1  abnormal brainstem evoked response, suggesting an intrinsic brainstem lesion.  (Id. at 213, 331.)

2  There is no other evidence of brain damage or similar dysfunction in the record, and no treating

3  physician analyzed these diagnostic studies.  Plaintiff has presented no evidence, other than Dr.

4  Wendel's report, indicating the significance of these test results or even mentioning them, despite

5  office visits during this time period, which indicates that they are not too significant. (Id. at 219-

6  25.)   Furthermore, Dr. Wendel's proposed limitations in reasoning ability and ability to

7  concentrate and remember are consistent with the ALJ's limitations which restricted her to

8  simple unskilled work and found she could do her past work as cashier.  These limitations more

9  than take into account any limitations found by Dr. Wendel in regard to brain dysfunction.

10  Moreover, the testifying medical expert had these records before him and nevertheless opined

11  that plaintiff could do simple unskilled work.

12         Plaintiff contends that the ALJ also improperly rejected the opinion of Dr. Landis,

13  plaintiff's treating psychologist, who thought that plaintiff had had major depression since he

14  first started treating plaintiff in 1980.  (Tr. at 134.)  Plaintiff argues that Dr. Landis' retrospective

15  opinion is relevant; however, plaintiff concedes that Dr. Landis did not treat plaintiff between

16  1987 and 1989, but only prior to and after this time period.  (Tr. at 58, 59.)  As noted supra in

17  this section, although such opinions may be relevant, they are less reliable where they concern

18  plaintiff's mental health.  Macri v. Chater, 93 F.3d at 545.

19         It is true that Dr. Anderson, the testifying medical expert, did not examine

20  plaintiff; however, his opinion may constitute substantial evidence.  "Opinions of a

21  nonexamining, testifying medical advisor may serve as substantial evidence when they are

22  supported by other evidence in the record and are consistent with it.  The ALJ can meet this

23  burden by setting out a detailed and thorough summary of the facts and conflicting clinical

24  evidence, stating his interpretation thereof, and making findings."  Morgan v. Commissioner of

25  Social Sec. Admin., 169 F.3d 595, 600 (9th Cir.1999) (citations omitted).  Furthermore, as

26  pointed out by defendant, SSR 83-20 recommends that a medical expert be called where the

1    onset date must be determined.

2            Here, the ALJ set forth an appropriate summary and findings.  For instance, he

3    summarized Dr. Anderson's testimony who stated after reviewing records for the pertinent time

4    period, that both Dr. Wendel's and Dr. Pilchman's records were consistent in describing

5    plaintiff's condition as slight to moderate.  (Id. at 363, 282.)  The expert noted that there were

6    very few records for this period, and did acknowledge the GAF of 35 assessed by Hollywood

7    Mental Health during this time. (Id. at 362, 365.)  Yet, he explained why he relied on the other

8    reports which were consistent in describing plaintiff's condition as not this severe:

9                    They gave her a G.A.F. of 35, which suggests that they found her
                     to be considerably more anxious and depressed and more
10                   dysfunctional than the subsequent evaluator three weeks later, that
                     is in the psychological CE.  Interestingly enough, that was so [sic]
11                   co-signed by a licensed psychiatrist.  The exam itself would've
                     been by a psychological intern.
12
                     So, in summary, I think there's evidence that indeed there were
13                   symptoms of principally of anxiety with secondary depressive
                     symptomatology, evaluated both under 12.06 and 12.04.  I don't
14                   think either separately or together so would she meet either the
                     listings based on the evidence in the records.
15

16   (Id. at 365.)

17           When the transcript is reviewed for the pertinent time period, it is clear that

18   plaintiff does not have much in the way of treatment during this time period.  There is a real

19   dearth of treatment records, especially in regard to mental health, between March 29, 1987 and

20   October 1, 1989.[9]  The Hollywood Mental Health treatment records consist of only two or three

21   visits, for example, as conceded by plaintiff.  (Id. at 199-213, 384-85.)  Even when the records

22   surrounding the pertinent time period are considered, as outlined above, they for the most part

23   \\\\\

24   \\\\\

25
         [9]  Plaintiff did receive treatment at the Department of Health Services during the relevant
26   time period; however, it appears to be mostly for physical issues.  (Id. at 214-35.)

1    support the ALJ's decision and constitute substantial evidence.[10]

2         B. <u>Credibility Analysis Was Proper</u>

3              Plaintiff contends that the ALJ rejected her credibility without clear and

4    convincing reasons.

5              The ALJ determines whether a disability applicant is credible, and the court defers

6    to the ALJ who used the proper process and provided proper reasons.  <u>See</u>, <u>e.g.</u>, <u>Saelee v. Chater</u>,

7    94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

8    credibility finding.  <u>Albalos v. Sullivan</u>, 907 F.2d 871, 873-74 (9th Cir. 1990); <u>Rashad v.</u>

9    <u>Sullivan</u>, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

10   supported by "a specific, cogent reason for the disbelief").

11             In evaluating whether subjective complaints are credible, the ALJ should first

12   consider objective medical evidence and then consider other factors.  <u>Vasquez v.  Astrue</u>, 572

13   F.3d 586, 591 (9th Cir. July 8, 2009);  <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 344 (9th Cir.1991) (en

14   banc).  The ALJ may not find subjective complaints incredible solely because objective medical

15   evidence does not quantify them.  <u>Bunnell</u> at 345-46.  If the record contains objective medical

16   evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature

17   of the alleged symptoms, including aggravating factors, medication, treatment, and functional

18   restrictions.  <u>See</u> <u>Vasquez</u>, 572 F.3d at 591.  The ALJ also may consider the applicant's: (1)

19   reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately

20   explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily

21   activities.[11]  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir. 1996); <u>see</u> <u>generally</u> SSR 96-7P, 61

22

23        [10]  Although the records discussed above were closer in time to the period at issue, it is
24   noteworthy that a slightly older evaluation by Dr. Vargas, dated April 10, 1986, found that on
     examination plaintiff had no overt mental or emotional disorder.  (<u>Id.</u> at 167.)

25        [11]  Daily activities which consume a substantial part of an applicants day are relevant.
26   "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
     activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in

FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party

testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony

and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792

(9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han

v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.

Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that

her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 572

F.3d at 591, quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d

at 1282.  Absent affirmative evidence demonstrating malingering, the reasons for rejecting

applicant testimony must be specific, clear and convincing.  Vasquez, 572 F.3d at 591.

       Plaintiff's credibility was properly questioned for the reasons pointed out by the

ALJ.  He first noted that her testimony was not supported by the record, as evidenced by the fact

that she stopped going to mental therapy after a couple of sessions.  The ALJ found it hard to

believe her testimony that she stopped going after being told by other group therapy members

that she was not welcome, as she could have turned to other therapy alternatives if she was truly

in need of serious help.[12]  The ALJ also questioned plaintiff's recall of symptoms during the time

period in question which was 16 to 18 years earlier, and opined that she may have been

describing symptoms from a later period after 1989 for which she was previously found disabled.

He concluded that based on the lack of medical evidence during this time period which would

\\\\\

---

any way detract from her credibility as to her overall disability.  One does not need to be utterly
incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
(quotation and citation omitted).

[12]  Plaintiff claims that she was informed that she did not belong there and that there were
mostly "rehab addicts and alcoholics" at the sessions.  Her citation to Regennitter v.
Commissioner of Soc. Sec. Admin., 166 F.3d 1294 (9th Cir. 1999), must be squared with Fair v.
Bowen, 885 F.2d 597, 603 (9th Cir. 1989), which permits the ALJ to consider "unexplained, or
inadequately explained, failure to seek treatment or follow a prescribed course of treatment."
Here, plaintiff did not fully explain why she did not then seek treatment elsewhere.

1  support the severity of her alleged symptoms, her subjective complaints alone were insufficient.

2  (Id. at 283.)

3         The record supports the ALJ's analysis.  As described in the previous section,

4  there is an utter dearth of medical records, especially mental health records, during the period at

5  issue.  The records upon which plaintiff most heavily relies, those of Dr. Sison, were properly

6  rejected by the ALJ, and as she noted, were "obviously exaggerated, unsupported by clinical

7  findings, contradictory to other medical records and presumabl[y] based on the claimant's own

8  subjective complaints."  (Id. at 281.)

9         As also previously mentioned, the ALJ pointed out that plaintiff, by her own

10  admission, visited Hollywood Mental Health only two or three times during the period in

11  question, raising the question of how severe could her mental impairment be.  (Id. at 199-213,

12  384-85.)  Dr. Vargas also questioned the severity of plaintiff's symptoms, and considered the

13  possibility of "somatic delusions."  (Id. at 167.)  He found that as of April 10, 1986, plaintiff's

14  symptoms "seem to be more of a nuisance than a source of major functional impairment on a

15  continuing basis."  (Id. at 168.)

16         Plaintiff also points to her numerous physical impairments to support her

17  credibility, including degenerative joint disease, obesity, angina, pelvic mass (for which she was

18  too fearful to get surgery), chemical/environmental sensitivities, hypertension, angina, and

19  possible brain damage.  The medical records for the period from March 29, 1987 to October 1,

20  1989, do not support the degree of severity alleged by plaintiff, however.  Records from LAC-

21  USC Medical Center, dated February 15, 1988, reveal possible TIAs, severe allergic reaction,

22  pain all over, possibly old Bells Palsy, inability to elevate eyebrow and slight mouth droop.

23  Apparently these problems were not thought to be too serious, as plaintiff was advised only to

24  return on April 27, 1988.  (Id. at 103.)

25         Records from the Los Angeles County Department of Health Services indicate

26  that on November 29, 1987, plaintiff was obese at 187 pounds, and complained of chest pain.  It

1    was noted that nitroglycerin relieved pain.  "Poor compliance" was noted, as was "resume all

2    meds!!"  (Id. at 113.) (emphasis in original).  As of November 9, 1989, shortly after the period at

3    issue ended, plaintiff's only diagnoses were hypertension, history of angina, musculoskeletal

4    pain, and pelvic mass.  (Id. at 112.)

5                    Records provided by the Department of Health Services indicated complaints of

6    chest pain and arthritis.  She had stopped taking medications.  (Id. at 215.)  On October 19, 1987,

7    plaintiff complained of feeling dizzy.  (Id. at 228.)  On March 30, 1988, it was again noted that

8    plaintiff had not been taking her prescription medications.  (Id. at 219.)  On August 3, 1988,

9    plaintiff had chest pain and dizziness, and obesity[13] was noted.  (Id. at 216.)   These are not the

10   types of problems which would serve as objective evidence sufficient to support the degree of

11   symptoms alleged by plaintiff.  To the extent that plaintiff had a legitimate allergy and/or

12   chemical or environmental sensitivity, the ALJ took this problem into account in assigning her to

13   work which precluded such exposure.  Further, although plaintiff claims her blood pressure was

14   consistently elevated during this time period, it might have been because plaintiff was not

15   consistently taking her medication.  A condition which can be controlled or corrected by

16   medication is not disabling.  See Montijo v. Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984)

17   (Addison's Disease controlled with medications deemed not disabling); Odle v. Heckler, 707

18   F.2d 439, 440 (9th Cir.1983) (rib condition controlled with antibiotics not considered disabling).

19   Nor did plaintiff undergo recommended surgery to remove her pelvic mass, diagnosed since

20   1984, because she was scared.  (Id. at 52.)

21

22         [13]  Plaintiff raises obesity, not as a separate issue, but as one of many ailments which she
     claims makes her subjective complaints more credible.  While obesity is no longer a grounds for
23   disability in a listing, it should be analyzed at the various steps of the sequential analysis as it
     affects other maladies.  However, while at the administrative level, the disability finding process
24   is non-adversarial, Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001), such is not the case at
     the district court level.  The undersigned will not raise theories on his own, and will presume that
25   the medical personnel did take obesity into account in determining the residual functional
     capacity of plaintiff.  Light work as a restaurant cashier is not the type of work that would be
26   precluded by obesity.

1    Although plaintiff testified at her most recent hearing regarding her subjective

2    complaints and her daily activities, the ALJ put that testimony in perspective by stating that

3    "[plaintiff] appears to have testified some years ago about her condition.  That testimony is on

4    the record and that testimony is in the transcript.  And I think, in my opinion, that is far more

5    reliable than now, 15 years after the fact.  I think it would be very difficult to have a person

6    testify as to her condition 15 years ago."  (Id. at 358.)

7    The ALJ addressed plaintiff's physical problems also, noting that her degenerative

8    disc disease was mild with no evidence of nerve root compression, motor loss, or sensory or

9    reflex loss.  (Id. at 280.)  He also noted that plaintiff's allergic reactions, obesity and other

10   functional limitations did not meet or equal the listings.  (Id. at 280-81.)  As discussed in the

11   previous section, the ALJ properly rejected Dr. Sison, who also treated plaintiff for her physical

12   ailments.  (Id. at 281.)  Therefore, those records have been properly discounted as exaggerated

13   and based on plaintiff's subjective complaints.

14   The court finds that the ALJ's credibility findings are supported by substantial

15   evidence.

16   C.  Hypothetical to the Vocational Expert

17   Plaintiff's last claim is that the ALJ's hypothetical to the expert did not include

18   the limitations imposed by the physicians whom the ALJ rejected or the limitations suggested by

19   plaintiff's subjective testimony, and since the ALJ erred in rejecting those opinions, their

20   limitations must be included in the hypothetical.

21   Hypothetical questions posed to a vocational expert must include all the

22   substantial, supported physical and mental functional limitations of the particular claimant.

23   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

24   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

25   expert's testimony as to available jobs in the national economy has no evidentiary value.

26   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

19

1   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

2   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

3   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

4   other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

5   based on alternate interpretations of the evidence, substantial evidence must support the

6   hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

7   849 F.2d 418, 422 (9th Cir. 1988).[14]

8          The first hypothetical, and the one on which the ALJ relied, limited plaintiff to

9   light unskilled work, with ability to lift twenty pounds occasionally and ten pounds frequently.

10  She could stand or walk for six out of eight hours.  She could be exposed to dust, fumes, gases

11  and other lung irritants on an occasional basis.  (Tr. at 386.)

12         In his findings, the ALJ changed the irritant exposure aspect of this hypothetical.

13  He stated that "she should avoid concentrated exposure to [such irritants]."  (Id. at 283.)

14  Plaintiff's objection that this hypothetical failed to include plaintiff's sensitivity to perfume and

15  her need to be around oxygen, is based on her own subjective testimony, which the ALJ properly

16  rejected.  See Section B supra.

17         The first hypothetical also took into consideration plaintiff's mental impairment

18  by limiting her to unskilled work.  The job of restaurant cashier does not seem to be the kind of

19  work which would aggravate anxiety, especially in light of the fact that it was plaintiff's past

20  work.

21         It is true that the hypothetical did not include any limitations assessed by Drs.

22  Sison, Pilchman, or Wendal; however, for reasons discussed in the first section supra, the ALJ

23  properly discounted these opinions or portions of them.  Here, as the court found the ALJ's

24  ───────────────

25  [14]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
    hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d
26  747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial
    evidence or reject them if they are not.  Id. at 756-757.

1   reliance on certain opinions and rejection of plaintiff's subjective testimony was proper, he was

2   not required to include limitations reflected by that rejected evidence in his hypothetical.

3   Osenbrock v. Apfel, 240 F.3d 1157, 1164 (9th Cir. 2001).

4   CONCLUSION

5          Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is

6   denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is

7   entered for the Commissioner.

8   DATED: 09/02/09                                    /s/ Gregory G. Hollows

9                                                      _____
                                                       GREGORY G. HOLLOWS
                                                       U.S. MAGISTRATE JUDGE
10  GGH/076
    calvento0678.ss.wpd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26